You may proceed. Your Honor, may it please the Court, I'm Chris Curley. I represent the Olympia School District and four of its supervisors, Jennifer Priddy, Frederick Stanley, William Lehman, and Barbara Greer. We're here today on appeal from the trial court's denial of qualified immunity for the four individual supervisors. In order to defeat a claim of qualified immunity, the plaintiff has to point to a case that articulates a constitutional rule that's an individual defendant that he or she is going to be violating the Constitution if they don't follow the rule. And so what we have to do here, right out of the gate, is examine what the legal landscape looked like in 2009 for when a supervisor, a school supervisor, could be a liable under the Constitution when a subordinate sexually molested or abused a student. Let me establish law that an employee of the school district has an obligation to protect a student against abuse. In a constitutional sense, I'm hesitating, Your Honor, because I'm concerned about Your Honor's use of the word protect against. That strikes, I mean, to me that sounds like the Washington State tort law standard for... Yeah, I take your point, so let me make it more precise. If an employee of the school district knows that there is abuse of a child going on and is a position to protect the child against that abuse, is it clearly established law that the employee who is in a position to protect against the abuse that he knows is going on, is that clearly established? Yes, I would agree with that. So the question in this case is, what's the degree of knowledge that your clients had? Ultimately, that's the question. And in 1994, as the court's aware from reading the briefs, the Fifth Circuit decided the case of Doe versus Taylor. I think three important points came from Doe. First, Doe recognized that under the 14th Amendment of the Constitution, a student has a liberty, interest, and that's addressable under 1983. So the question isn't the legal principle, the question is how much notice did these people have? That's it, and of what? So let's go cut to the chase with, say, Greer and Stanley and these multiple complaints about touching and the games and the ride-alongs, which were in violation of policy. Why isn't that sufficient notice? Well, first of all, Your Honor, we have to be very careful, I think, about the idea that there were multiple complaints. Well, how many were there? Well, there was one complaint from an individual named Robert McGiggin in the fall of 2007. He's the fellow who claims he called the bus barn and said, my daughter Lily, she, excuse me, he's the one who called the bus barn and said that it had been reported to him by his son that at times this bus driver, who he didn't name, would stop the bus, play hide-and-seek, and Why wouldn't that be adequate, even without the name being mentioned? Because the school district certainly can determine what driver was, what drivers were driving that kid. Because I don't think that that rises to the level of the test articulated in Doe, which was there has to be notice of facts or a pattern of inappropriate sexual behavior pointing plainly to the conclusion that the subordinate was sexually abusing the student. And what's important about Doe is not only the test articulated, but also how subsequent courts dealt with Doe and applied the test. About a year later, in a case called Plumeau versus Yamhill, the Oregon, an Oregon District Court, not only adopted the Doe test, they even went a little bit further and examined what courts from other parts of the country had done in terms of imposing supervisor liability in sex abuse cases. And they cited a case from, let me make sure I get this right, they cited a case from Missouri called Doe A versus Special School District St. Louis, and what the Plumeau court said about that case was that here's a case where facts arguably more specific than those with which we are dealing here weren't sufficient to survive summary judgment, and the Doe A case actually involved a school bus driver. And there were reports in that case that the school bus driver was stopping the bus on the route, that he was kissing children, and there was even a complaint that, to one of the supervisors, that the, that this bus driver had put his hands down a kid's pants and that he would touch kids on the crotch. So as late as 1995, you know, we have a, we have a court in this, in the Doe test and saying here's a situation where, you know, we've got facts that aren't sufficient to establish a supervisor liability. I can point to this case from Missouri. Let's go back to where we started as to what happened here. We had McGuggin, which you started to talk about. Then we have the Tanya Chambers report that's pulling over and not the bus stop. Then you've got the Kevin Gearheart report, and then there was maybe a fourth report about the daughter of Ward. So that's a pretty clear succession of reports. Well, let me talk about those separately. The Gearheart report happened in October of 2009. He's the parent who said that his daughter got off the bus one day, didn't seem to be her chipper self, didn't want to ride the bus anymore. And he also, the bus was also 33 minutes late that day, and he, he actually contacted Barbara Greer. You know, that, that's the one situation we have in the record where there was an actual report made to a specific supervisor defendant, Barbara Greer. We know that because of the email that she I don't think that's enough under Doe versus Taylor to establish that this is, this is, this is. Was there any follow-up after that? Apparently not. I mean, you know, when, when you have a child in an abuse situation who tells you that something is not right, that is a red flag over the schoolhouse. Well. And then there's other circumstances, and there had been these other events prior to that. So, you know, I don't know how many years you have to go before you don't get qualified liability. Maybe there's jury issues about timing, but if you take it in the light most favorable to the plaintiff, you've got some pretty significant reporting here. But, but, but we're, but, but that's not the test for qualified immunity. The issue isn't, you know, taking facts in the light most favorable to the plaintiff, I don't think, with respect to qualified immunity. We have to look at what the law was in 2009. What's the test? And the law was that a child has a right to be free from abuse, right? Yes, but, but that, but that is way too general for purposes of qualified immunity, isn't it? I mean, I think our Supreme Court and even the Ninth Circuit recently has been very clear about the specificity that's required in the case law and before somebody loses qualified immunity. Now, you can't just say that it was clearly established that a child has a right to be free from sexual abuse and to feed a claim for qualified immunity. What, what you need is a case that has a specific rule. You said something, you said something a moment ago that you may or may not have intended to say or perhaps I misheard it, but I thought I heard you say that for purposes of qualified immunity on summary judgment, we don't take the facts most favorable to the, to the plaintiff. Did you mean that? That's not right. Okay. That's right. I'm sorry about that. Okay. You just didn't mean to say it. I was going to just ignore it because it's not right. Obviously, for purposes of qualified immunity, you know, you take the facts that are essentially undisputed and ask whether the case is met. So I'm sorry about that. But, but in order for the specificity requirement to be met, you know, my position is that not only do you need something in the case law that articulates a specific rule, I mean, you need, you need cases that apply the rule in such a way that would put a reasonable supervisor on notice that their behavior in this specific situation is violative of the Constitution. And if you look at Doe, Plameau, and the cases that were cited by Plameau, where the court looked at a set of facts and said this isn't enough, we don't have that here. We have a report of hide-and-seek and tickling. We have a report of a student getting off the bus one day and, and not being her chip herself, and then the bus being 33 minutes late. In addition to the reports, we also have a very unusual pattern of this man doing ride-alongs to an extraordinary degree. The policy of the school district is not to permit them, except in special circumstances, which don't apply here. So not only are we getting reports about him, we're finding what looks on its face to be quite odd and maybe suspicious behavior. So I think I want to put that into the mix in terms of what they should, what should have put them on notice. I'm not sure about that, Your Honor. If you, if you look at what the courts were saying about the No, this is not what courts are saying. This is just sort of a factual question. I'm in the supervisor's position. Here's what I know. I've been getting these reports and this man loves to ride along on other buses. Why? Your Honor, I just don't think that's enough and... But I want to put it into the mix as one of the things that is relevant to the consideration. Fair enough, but I think... I guess, I mean, you don't think it's enough, but I guess what would be enough? I mean, you've got these circumstances pointing to abuse by the bus, by a bus driver without specific follow-up in many situations. So the school can turn a blind eye for how long? I mean, that's the question. And again, Your Honor, I find myself being pulled over into a discussion of tort law with respect to foreseeability and reasonableness and a duty to protect... It's not foreseeability, it's intervention. Yeah. I mean, that's what you have here. It's not, well, will he do it again? Let's wait and see. No, it's a question of intervention, investigation, notification. I keep coming back to what a supervisor would regard as being the legal landscape in 2009. Right. When, when might I be liable under the Constitution? And if you look at Doe and the cases that followed Doe, particularly the Plumeau and the cases that were cited, things like tickling, a bus driver stopping the bus en route, even, even kissing a kid. And again, as a lot of these courts have said, these are things that when we look at them in hindsight, maybe they were indicators that something was going on. And maybe that establishes liability under tort law, but not a violation of the Fourth Amendment of the Constitution. And so, and Your Honor, another thing I wanted to mention is that I think the Taylor, the Doe versus Taylor test is the appropriate test. And it's what a supervisor back in 2009 would have thought the test was. And it's consistent with a case that came out in 2009 from the United States Supreme Court, County of Lewis versus, excuse me, County of Sacramento versus Lewis, where the court emphasized that in a 14th Amendment deprivation of substantive due process case, mental state is important. And the behavior of the individual defendant who's alleged to have violated somebody's Fourth Amendment rights has to be so egregious that it shocks the learned of a factor pattern of inappropriate sexual behavior. Did that occur? Yes. You think it doesn't be? Well, isn't it then a factual question about whether these are indicators of sexual behavior? That's the first. The second one is delivered in difference by not taking any action to prevent or stop. And then, of course, the third one is that then led to this Fifth Circuit and notice to everybody. I'm having some trouble seeing why this case doesn't fit into that construct. And all I can say, Your Honors, is if you look at the facts that the courts were faced with in those situations where they applied the Doe test and concluded that it wasn't enough, that the behavior that was reported to the supervisor was not notice of facts or a pattern of to the to the subordinates sexually abusing the student. Okay, well, we'll ask. We'll talk to your colleague about that. Okay. Thank you. May it please the court. My name is Kevin Hastings, and it's my privilege to be here today to represent the plaintiff appellees in this case. We trust our drivers. That was the mantra of the bus barn at the Olympia School District under the direction of Mr Frederick Stanley and his second in command, Barbara Greer. Other than that, Mr Mr Stanley and the evidence shows that he did. He failed to adhere to his own policies and prohibition of letting drivers ride along on buses beginning right away in 2005 when Gary Schaefer was 26 years old and came as a bus driver. He started riding on buses and riding along on any bus that he could get his hands on targeting the kindergarten buses, the pre K buses and the special need routes. And he testified later that he targeted those because those were the individuals that he knew were the least likely to assaulting them on these routes. Well, we know he's a bad guy, but he's not here. It's what the school district knew or the nature of the potential abuse, whether it put him on notice. And that's really the heart of his argument that he I don't think is denying that this is a terrible situation that abuse occurred. But the individual pieces of evidence in the school districts of you don't get you to the conclusion that you would like. So would you address that? Certainly, Your Honor. So it seems to me that the conversation so far has been more as to whether we have issues of fact as to whether there is a constitutional violation that occurred as opposed to whether the law was clearly established. It seems to me that the law is clear that Children have had for a very long time a recognized interest in their body security. And so on that question, I think that it's the totality. He would argue that that's true, but that's not narrow enough. You need constitutional right with certain kind of facts that would put you on notice that now you might be in legal jeopardy. And I would respectfully disagree with that position. I think that the cases, all of the cases that are discussing and that that rule applies in the abuse cases and the analysis is shifted, at least in the published cases that we see and read about, as to whether there was deliberate indifference, whether, for example, the Doe v. Taylor test, I think, is driving toward whether we can understand whether there was deliberate indifference there. Not so much on the clear, the law was clear. I think that everyone would recognize that our most precious cargo on school buses have their constitutional right to their body integrity. And also, there's also the point of law from the Hansen v. Black case, which is talking about supervisory liability specifically, and that that can exist even without over participation in the Offensive Act if the supervising officials implement the policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation. And I think that taking everything into consideration, we have a policy here where bus drivers are supposed to be on a bus for a purpose. They're supposed to be there, they're supposed to be paid for their time, and they're supposed to be there for an educational purpose. Here we had a situation where that was the rule. Fred Stanley knew that was the allowed Gary Schaefer to ride on whatever bus he wanted with kindergarten girls and sit in the same seats and tell knock-knock jokes and show them pictures on his phone and engage in other peer-to-peer behavior, some of which made it, in fact, to the district. And when they received those complaints, absolutely nothing was done. And we have... What about the second, the wouldn't they at a minimum stand in a different position? Well, I think that, yeah, I think that a different analysis does apply to them, but ultimately they're the top policymakers. And their role in this case is unique because, as the evidence shows, once Gary Schaefer admitted in 2011 to abusing scores of young female girls on buses, he identified some by names. S.A. in this case has a very unique name. And there was no effort made by Miss Pretty or Mr. Lamont at the time to identify. But that's a different question from preventing abuse. The abuse had already taken place. Mr. Schaefer had already been apprehended. There was no danger at that point of further abuse by him. So we're not talking about protecting them from abuse. We're talking about obstructing or at least not cooperating with an investigation. But that's a very different claim. And I don't know that that's the claim in front of us. Right. And that is absolutely correct, Your Honor. And I think, though, that it is in with this pattern and practice from the very beginning of a disregard for the rights of the children who are riding on these buses. So that may be what their behavior, in your view, may be evidence of sort of a casual approach to all of this. But that doesn't necessarily make them liable under the theory that you've got. Insofar as Mr. Lamont and Miss Pretty? Exactly. For after, for the failure to report, and as the Honorable Benjamin Settle pointed out, that there was, there's not a causal link there. And that's my sticking point for those two defendants. Right. But, but they were, they were also. If you want to be precise, I think the argument is, now that I know about it, I have a further obligation to tell the families and report about it. Is that the argument? I mean, what is their obligation? What constitutional obligation are you trying to link to those individuals, Lamont and Pretty? Well, I think that it comes back ultimately to their integrity as children, as humans. I think that the evidence that's in the record shows that the withholding of this information delayed the disclosure of it, delayed the parents' abilities to mitigate damages. Now we're kind of in a different constitutional right there, which is basically, I mean, it comes up when you think about the Catholic church cases, for example. You know, was there, was there some obligation? Of course, that's a church situation, but you're saying that there's an obligation, a constitutional obligation, to now notify the parents now that they've done an investigation, now that they know certain things. Is that the claim that you're that there's case law supporting the principle that the failure to, in Washington, we have the mandatory reporting statute. Both Mr. Lamont and Ms. Pretty are mandatory reporters and have admitted as much in their deposition testimonies. And I think that the violation of that, I think that there is law supporting that a violation of a statute like that is consistent with, in evidence of a constitutional violation. Wait a minute, you just told me that they're violating state law and then you told me they're violating the federal constitution because they're violating state law? I'm not sure I'm understanding you right. Right, and I don't have the site here in front of me, Your Honor, but the case that I'm thinking of in my head, it discusses that the violation of state law or a law can go toward consideration as to whether there's been a constitutional violation. In here, the purpose of the mandatory reporting statute is to prevent and curtail further abuse as well as to mitigate any effects of it so we can help our children. And I think that violating that is evidence of a constitutional violation. But bringing it back, because I realize that we have this causation issue with regard to the reporting because he had already been arrested and apprehended. I think that Ms. Pretty and Mr. Lamont were there at the administration. They were in charge at the time and that they were allowing these ride-alongs to occur on their watch and that they're in the same position as Mr. Stanley and Mrs. Greer. Counsel, may I ask you a question, please? So, with regard to the the appellants, who didn't act promptly enough, identifying victims or telling parents after the horse was already, in a sense, out of the barn and the guy had been arrested, does their attitude, is that relevant to whether there was deliberate indifference by Grant and Stanley initially in their not following up on complaints? Does it show, can a jury hear that and consider that when they assess whether the school district was sleeping at the switch and, you know, not taking action to protect kids? Absolutely, Your Honor. I think that the failure to make reasonable efforts to identify a pedophile by our top administrators in a school district is tantamount to deliberate indifference to their rights as individuals. Yes, I do believe that. And the support that we have in the record for, at least the link to damages, is from Dr. Gilbert Kleinman is opine that the delay in treatment does exacerbate damages and inhibits their ability to mitigate those losses. Okay, thank you. I'm intrigued by that last statement that delay in treatment increases the harm. Now, does that give rise to a constitutional violation when someone on Is that, is that, is there a case law that tells us that that is in itself a violation? That is to say, okay, I know that this child was abused. The parent is coming to me, or I could go to the parent and tell him or her that his or her child was abused, but I'm not going to do it, thereby increasing the harm. Is there cases that I found in my briefing at the trial level dealt primarily with the Eighth Amendment and prisoner medical needs? There was one 14th Amendment case that I cited in the brief that I think weighs in on that, but I'm not sure if we have a case directly on point with that issue. Yeah, for qualified It imposes a different obligation than the first one you talked about. You mean between Mr. Lamont and Ms. Priddy and then Mr. Stanley and Mrs. Greer? Yes. Right. And I would say that they were, I think that if we look at the evidence as a whole, I think that they were part and parcel with the moving force of the policies that were at play here with regard, under the rule articulated in the Black v. Hansen case, Hansen v. Black, that even without over-participation of the Offensive Act, implementing a policy so deficient that the policy itself has a reputation of constitutional rights. And here we have the administrators, the top administrators, overseeing Mr. Stanley and his disregard for what was going on and Mr. Schaefer riding on buses at his leisure whenever he wanted, without any sort of monitoring or systems in place to ensure that he wasn't harming children. Thank you. Thank you, Your Honor. I think you might have a little rebuttal time. Ms. Morris. Yeah, I'll give you some time. I'll give you a minute. I just wanted to touch on one thing that frankly puzzles me, having poured over the case law for the last couple of days. I'm not entirely clear where the concept of supervisor or municipal liability for a sexual abuse of a student is in light of Doe v. Taylor. More specifically, can there be a custom or a policy that's implemented by a supervisor that creates the risk of sex abuse? Who's responsible? Well, again, Your Honor, the reason I'm bringing this up is because you might argue in this case, and I think Your Honor's lines, well, you know, they had a policy or some sort of a custom at the school district where they were turning a blind eye to these things. No, I think that's not the issue. No, it's a factual question whether they turned a blind. They may or may not have had a policy, but they may have had the reality of what happened, which may be a factual issue, but I'm less, at this point, inclined to think there's some policy as you're laying out. My only point was simply to reference Doe v. Taylor's sort of rejection or adoption of the same rule for municipal liability as for supervisor liability and then Plameau. Supervisory liability in the individual sense is quite different from county liability. That's Manil that does require a policy or a custom, but with respect to the individual, even the individual supervisor, it may be that there's something about whether or not there's qualified immunity, but policy and custom need not be established. I agree. Thank you. Thank you. Thank you both for your argument this morning. WH v. Olympia School District is submitted and we're adjourned for the morning.
judges: McKeown, W. Fletcher, Gould